IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Mesa Underwriters           Case No. 3:14CV2201
 Specialty Insurance Co.,

      Plaintiff,

    v.                    **ORDER**

Ronald L. Myers, et al.,

      Defendants

    This declaratory-judgment case asks whether an insurance company must defend its insured in a state-court lawsuit.

    The plaintiff, Mesa Underwriters Specialty Insurance Company, issued a general commercial liability policy to defendants Ronald L. Myers and his sole proprietorship, Myers Recycling and Painting (collectively Myers).

    During the policy's term, one of Myers's clients filed a suit alleging that Myers's negligence caused roofing tar to escape from a roof and flow into Lake Erie. Myers asked Mesa to defend the suit, but Mesa refused. Mesa then sought a declaratory judgment stating that it has no duty to defend or indemnify Myers. (Doc. 1).

    Pending are counter-motions for summary judgment. (Docs. 39, 41). For the following reasons, I exercise my discretion to assume jurisdiction over the case and grant Mesa's motion and deny Myers's motion.

**Background**

In April, 2013, Myers contracted to do roofing work for Sireco III LLC, a business in Sandusky, Ohio. (Doc. 10–3 at ¶¶12–13). Myers performed this work – removing stones from the roof, "patching all bad sections of the roof," and sealing the roof – on April 30. (*Id.* at ¶12).

To seal the roof, Myers used a roofing-tar sealant called "Non-Fibered Roof, Fence, & Foundation Coating." (Doc. 39 at ¶¶6, 9). This substance is, *inter alia*, a "skin irritant" and "harmful or fatal if swallowed[.]" (Doc. 10–3 at ¶¶17, 27; Doc. 39 at ¶7). An accompanying "Material Safety Data Sheet" for the sealant explains that:

- "[i]n the event of a spill," the user should "[t]ake immediate steps to stop and contain the spill"; and

- persons applying the sealant should "wear eye protection (chemical splash goggles), skin protection (chemical resistant gloves), and respiratory protection[.]"

(Doc. 39 at ¶7).

Myers expected the sealant to harden within twenty-four hours after coming in contact with the roof, but it did not. When rain swept through the area eleven days later, it washed the sealant off the roof and into the downspouts, and from there it flowed into the City of Sandusky's sewer system, Sandusky Bay, and Lake Erie.

The Ohio Environmental Protection Agency notified Myers of the incident, and he engaged SpillTek Environmental Services, LLC, to remediate the damage. (*Id.* at 37; Doc. 10–3 at ¶¶20–21). Myers also notified Mesa. (Doc. 39 at 57).

SpillTek began its work on May 11. Four days later, however, Myers – who had learned that Mesa would not cover his costs to SpillTek – ordered the work to a halt. (Doc. 10–3 at ¶¶21–22). Thereafter, the United States Coast Guard notified Sireco that it "may be considered the responsible

party and therefore may be financially responsible" for rectifying the situation. (*Id.* at ¶17). Sireco then hired SpillTek to finish the clean-up work. (*Id.* at ¶31).

Sireco also received orders from the Coast Guard and the Ohio EPA to "remove the source of the liquefied [sealant]" – i.e., the sealant remaining on the roof. (*Id.* at ¶35). Sireco hired another company to skim the sealant from the roof, but its efforts were, owing to the sealant's viscosity, unsuccessful. Sireco had to "remove portions of the underlying roof in order to capture the liquefied [sealant] . . . for proper off-site disposal." (*Id.*).

In July, 2013, Sireco sued Myers in the Common Pleas Court of Erie County, Ohio. It alleged Myers breached his contract with Sireco, and was negligent, when he:

- "fail[ed] to select and use proper materials when conducting work on [Sireco's] roof";
- "fail[ed] to properly apply the [sealant] to the [b]uilding"; and
- "us[ed] the [sealant], which is defective and is not suitable for its intended use."

(*Id.* at ¶¶40, 46).

Sireco sought damages "in the form of remediation costs owing to SpillTek [and two other companies], property damage, damages related to the removal of the roof and repair of the Building, and other monetary damages in excess of $25,000." (Doc. 10–3 at ¶¶43, 47).

Myers notified Mesa of Sireco's suit, but Mesa continued to refuse to defend or indemnify him. (Doc. 39 at 39).

Mesa first explained that Myers's policy did not cover damages that "Sireco seeks because of [Myers's] alleged defective workmanship[.]" (Doc. 1–6 at 10).

3

To defend that position, Mesa relied on the Ohio Supreme Court's decision in *Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 133 Ohio St. 3d 476 (2012). That case holds that "[c]laims of defective construction or workmanship brought by a property owner" do not trigger an insurer's duty to defend because such claims "are not claims for 'property damage' caused by an 'occurrence' under a commercial general liability policy." *Westfield*, *supra*, 133 Ohio St. 3d 476, at syll.

In light of *Westfield*, Mesa concluded that its policy "does not cover [Sireco's] alleged damages related to removal of the roofing product and repair of the roof." (Doc. 1–6 at 10).

Mesa recognized that it might have had to cover the "consequential damages" Sireco sought – i.e., the clean-up costs that it incurred to capture the sealant that entered Lake Erie. (*Id.*). But Mesa determined that the policy's "Total Pollution Exclusion" relieved it of any obligation to do so. (*Id.* at 11–12).

In 2014, Mesa filed this suit for a declaratory judgment.[1]

**Jurisdiction**

Under the Declaratory Judgment Act, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

"[T]he Declaratory Judgment Act only provides courts with discretion to fashion a remedy in cases where federal jurisdiction already exists, and therefore, the Court must have an independent

---

[1] It joined, as additional defendants, Sireco and SpillTek. With the parties' concurrence, I dismissed SpillTek from the suit after learning it had accepted, as compensation for its claims associated with the clean-up efforts, a payment from the Oil Spill Liability Trust Fund. (Docs. 20, 26). Sireco did not respond to Mesa's motion, and I will award summary judgment against Sireco as well, given the undisputed evidence showing that Sireco's claims against Myers are not covered. *See* Fed. R. Civ. P. 56(e)(3).

4

basis for subject matter jurisdiction." *Securian Fin. Servs., Inc. v. Treder*, 2016 WL 3226172, *3 (E.D. Mich.).

The complaint and Mesa's jurisdictional statement establish that I have diversity jurisdiction.[2]

But my jurisdiction under the Act is discretionary, not mandatory. *Bituminous Cas. Corp. v. J&L Lumber Co.*, 373 F.3d 807, 812 (6th Cir. 2004). Accordingly, I must address, on a case-by-case basis, "whether the exercise of jurisdiction is appropriate[.]" *Allstate Ins. Co. v. Das*, 86 F. Supp. 3d 716, 720 (E.D. Mich. 2015).

"The essential question is always whether a district court has taken a good look at the issue and engaged in a reasoned analysis of whether issuing a declaration would be useful and fair." *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014).

Five factors bear on this inquiry: 1) whether the declaratory action would settle the controversy; 2) whether it would serve a useful purpose in clarifying the legal relations in issue; 3) whether one party is using the declaratory remedy for purposes of "procedural fencing" or "to provide an arena for res judicata"; 4) whether the declaratory action would increase friction between state and federal courts; and 5) whether there is a more effective alternative remedy. *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).

Though the parties have not addressed this issue, I have concluded that exercising jurisdiction here would be fair and useful.

Although I cannot resolve the underlying state-court litigation, a declaratory judgment will define the legal relationship between Mesa and Myers *vis-a-vis* Mesa's alleged duty to defend Myers

---

[2] Jurisdiction is proper under 28 U.S.C. § 1332(a)(1) because Mesa is citizen of Arizona and New Jersey, and all defendants are citizens of either Colorado, Florida, Massachusetts, New Hampshire, Ohio, Vermont, and/or Wisconsin. (Doc. 10 at ¶¶1–6; Doc. 49 at 1–2).

in that suit. My decision will therefore "provide a final resolution" – subject, of course, to any appellate proceedings – "of the discrete dispute presented" in Mesa's complaint. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 557 (6th Cir. 2008).

Accordingly, while the first *Grand Trunk* factor does not favor exercising jurisdiction, the second strongly does.

There is no suggestion, moreover, that Mesa's decision to seek a federal declaration involves "procedural fencing" or any kind of gamesmanship.

To the contrary, whether Mesa has to defend Myers is not an issue in the state-court action.[3] Moreover, Myers himself wants a declaratory judgment from this court. *Cf. Hoey*, *supra*, 773 F.3d at 760 (fact that all parties wanted court to issue declaratory judgment was relevant, but not dispositive, consideration).

The third *Grand Trunk* factor therefore favors exercising jurisdiction.

Furthermore, the coverage dispute turns on the application of settled principles of Ohio law to unambiguous contractual language and the allegations in Sireco's complaint. I am thus on no worse a footing than the Common Pleas Court when it comes to resolving the coverage issue. *Scottsdale*, *supra*, 513 F.3d at 560 (absence of novel issues of state law supports district court's exercise of jurisdiction).

Likewise, the principal factual questions in the Ohio litigation – whether Myers actually breached the contract or was negligent – have no bearing on whether Mesa has a duty to defend. *Ward v. United Foundries, Inc.*, 129 Ohio St. 3d 292, 295 (2011) ("The duty to defend is determined by the scope of the allegations in the complaint."); *Hastings Mut. Ins. Co. v. Village Communities*

---

[3] The Common Pleas Court has stayed the case pending a resolution of this coverage dispute.

*Real Estate, Inc.*, 2014-Ohio-2916, ¶12 (Ohio App.) ("The action's ultimate outcome or the insurer's ultimate liability does not determine the duty to defend an action."); *see also* p. 13, *infra*.

The fourth *Grand Trunk* factor therefore favors exercising jurisdiction.

Finally, Mesa might have been able to obtain a declaratory judgment in state court, whether by intervening in the Erie County litigation or filing an independent action under O.R.C. § 2721.01, *et seq*. But nothing before me suggests that a state-court declaratory action would be more effective than a federal-court declaratory action.

This is, in sum, an appropriate case in which to exercise jurisdiction.

### Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### Discussion

The policy that Mesa issued to Myers covers "'property damage' [that] is caused by an 'occurrence.'" (Doc. 1–5 at 32).

7

An "occurrence," the policy says, is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 45). "Property damage" means "[p]hysical injury to tangible property, including the resulting loss of use of that property," though multiple exclusions in the policy further narrow that definition. (*Id.*).

Mesa argues that it has no duty to defend Myers because Sireco's damages resulted, not from an "occurrence," but from Myers's negligent workmanship.

According to Mesa, "[e]very aspect of Sireco's [complaint] against Myers . . . relates to the[ ] alleged failure to properly perform work on the roof" of Sireco's building. (Doc. 39 at 17). Mesa contends that, under *Westfield*, an insured's "failure to perform in a workmanlike manner does not constitute an accident or occurrence" for purposes of a commercial general liability policy. (*Id.*).

Mesa argues in the alternative that, even if there had been an "occurrence," at least four of the policy's exclusions relieve it of the duty to defend Myers.

Myers responds that Mesa must defend him because Sireco's damages "could not have [been] anticipated or controlled for[.]" (Doc. 41 at 7).

He maintains that "the undisputed evidence" developed during discovery in this case shows that he was not negligent, and that, consequently, Sireco's damages were not "'predictable consequences of doing business.'" (*Id.*) (quoting *Westfield*, *supra*, 133 Ohio St. 3d at 480). Instead, Myers argues, those damages were "consequential in nature" and thus within the scope of his policy. (*Id.*).

Finally, Myers contends that none of the exclusions on which Mesa relies absolves it of its duty to defend Sireco's suit.

8

**A. The Insurer's Duty to Defend**

An insurer has an absolute duty to defend its insured when a complaint states a claim that arguably falls within the scope of coverage that the insured's policy provides. *Ward*, *supra*, 129 Ohio St. 3d at 295; *JTO, Inc. v. State Auto. Mut. Ins. Co.*, 194 Ohio App. 3d 319, 322 (2011).

This duty to defend is broader than the insurer's duty to indemnify.

"Even though the underlying action eventually produces a result which does not trigger a duty to indemnify under the policy, this fact is not determinative of whether the insurer had a duty to defend the action." *Motorists Mut. Ins. Co. v. Nat'l Dairy Herd Improvement Ass'n*, 141 Ohio App. 3d 269, 275 (2001).

"Coverage analysis largely turns on the damages sought." *Park-Ohio Holdings Corp. v. Liberty Mutual Fire Ins. Co.*, 142 F. Supp. 3d 556, 561 (N.D. Ohio 2015) (Gwin, J.); *accord Westfield*, *supra*, 133 Ohio St. 3d at 482.

"If the damages are for the insured's own work, there is generally no coverage. If the damages are consequential and derive from the work the insured performed, coverage generally will lie." *Park-Ohio Holdings*, *supra*, 142 F. Supp. 3d at 561.

"Once it is determined an insurer must defend one claim within a complaint, it must defend the insured on all other claims within the complaint even if they bear no relation to the policy coverage." *Hastings*, *supra*, 2014-Ohio-2916, at ¶11. "But if all the claims are clearly and indisputably outside the contracted coverage, the insurer need not defend the insured." *Ward*, *supra*, 129 Ohio St. 3d at 295.

"Whether a given claim is covered under the terms of an insurance policy is a question of law for the court to decide." *Stafford v. Jewelers Mut. Ins. Co.*, 554 F. App'x 360, 373 (6th Cir. 2014) (citing *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St. 2d 166 (1982)).

### B. Faulty-Workmanship Claims and Commercial General Liability Policies

As already noted, *Westfield*, *supra*, 133 Ohio St. 3d at 484, holds that "claims of defective construction or workmanship are not claims for 'property damage' caused by an 'occurrence' under a commercial general liability policy[.]"

Such policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 481. While these policies ordinarily do not define "accident," the Ohio Supreme Court's past insurance cases hold that the plain meaning of "accident" is something that is "unexpected, as well as unintended." *Id.* (internal quotation marks omitted).

But the court in *Westfield* added that "[i]nherent in the plain meaning of 'accident' is the doctrine of fortuity," an idea that is "central to the notion of what constitutes insurance." *Id.* (internal quotation marks omitted).

It then explained why an insured's own negligent work is never "fortuitous," and why the consequential damages of such negligence are "fortuitous":

> Insurance coverage is bottomed on the concept of fortuity. Applying this rule in the construction context, truly accidental property damage generally is covered because such claims and risks fit within the statistical abstract. Conversely, faulty workmanship claims generally are not covered, except for their consequential damages, because they are not fortuitous. In short, contractors' "business risks" are not covered by insurance, but derivative damages are. The key issues are whether the contractor controlled the process leading to the damages and whether the damages were anticipated.

> Coverage analysis largely turns on the damages sought. If the damages are for the insured's own work, there is generally no coverage. If the damages are consequential and derive from the work the insured performed, coverage generally will lie. The underwriting intent is to exclude coverage for the contractor's business risks, but provide coverage for unanticipated consequential damages.

*Id.* at 481–82 (some internal quotation marks omitted).

### 1. Coverage Turns on the Damages Alleged

*Westfield* itself refutes Mesa's principal argument in this case, which is that coverage never lies under a commercial general liability policy when a property owner sues an insured for negligence or defective workmanship. (Doc. 39 at 15–17).

*Westfield* makes plain that "[c]overage analysis largely turns on the damages sought," such that when "the damages are consequential and derive from the work the insured performed, coverage generally will lie." 133 Ohio St. 3d at 482.

That was the law in Ohio before *Westfield*, and it remains the law after. *E.g.*, *Cincinnati Ins. Cos. v. Motorists Mut. Ins. Co.*, 18 N.E.3d 875, 880–81 (Ohio App. 2014) (*Westfield* did not negate insurer's duty to defend insured in a suit that "sought damages from the consequential risks that stemmed from the work of [the insured]"); *Heile v. Herrmann*, 136 Ohio App. 3d 351, 354 (1999) (no coverage where "[t]he damages alleged by the Heiles all relate to Hermann's (or his subcontractors') own work, *not to any consequential damages stemming from that work*") (emphasis supplied); *Paramount Parks, Inc. v. Admiral Ins. Co.*, 2008-Ohio-1351, ¶26 (Ohio App.) ("In other words, the policies do not insure an insured's work itself; rather, the policies generally insure the consequential risks that stem from an insured's work."); *Burlington Ins. Co. v. PMI Am., Inc.*, 862 F. Supp. 2d 719, 728 (S.D. Ohio 2012) (recognizing that "[e]ven the Ohio courts that have found that

faulty workmanship is not a covered occurrence have readily found coverage where there is collateral damage to property other than the insured's work product").

I therefore reject Mesa's argument that the underlying nature of Sireco's claims, standing alone, relieves Mesa of a duty to defend. Instead, I must decide whether the damages Sireco alleges "relate to [Myers's] own work," in which case there is no coverage, or represent "consequential damages stemming from that work," in which case coverage lies. *Heile*, *supra*, 136 Ohio App. 3d at 354.

### 2. Non-Covered Damages

According to the complaint, Sireco sustained "property damage" and seeks "damages related to the removal of the roof and repair of [its] Building." (Doc. 10–3 at ¶¶43, 47). Sireco contends that these damages were the result of Myers's failures to select an appropriate sealant to use on the roof and to apply the sealant correctly. (*Id.* at ¶¶40, 46).

These damages relate solely to Myers's own work on the roof, and they represent the costs Sireco has expended, or must in the future expend, to correct that allegedly negligent work.

Ohio law is clear that commercial general liability policies do not "provide coverage where the damages claimed are the cost of correcting the work itself." *Heile*, *supra*, 136 Ohio App. 3d at 354. Accordingly, these damages are outside the scope of Myers's policy. *See Allied Roofing, Inc. v. W. Reserve Grp.*, 2013-Ohio-1637, ¶11 (Ohio App.) (claim seeking damages for subcontractor's negligent removal and reinstallation of air-conditioning units, which occurred while subcontractor was performing his obligations under a contract, did not trigger duty to defend); *Paramount Parks*, *supra*, 2008-Ohio-1351, at ¶¶24–27 (policy did not cover damages related to engineering firm's defective construction of roller coaster).

Myers argues, however, that the damages to Sireco's roof and building are covered consequential damages.

Because "the undisputed evidence [shows] that [he was] not negligent in applying the roofing product," Myers contends, the damages at issue were not the "predictable consequences of doing business[.]" (Doc. 41 at 7). Rather, they are the type of fortuitous damages that his policy insures against.

The "undisputed evidence" to which Myers refers is a report that a claims investigator prepared for Mesa. (Doc. 40–8). Even assuming Myers has accurately summarized the contents of that report, Ohio law precludes me from considering that evidence in characterizing Sireco's damages claims.

"The inquiry into the insurers [*sic*] duty to defend must naturally begin with a close scrutinization of the allegations of the complaint." *Nat'l Dairy Herd*, *supra*, 141 Ohio App. 3d at 279.

"If such a review reveals claims which 'potentially' or 'arguably' fall within the purview of the policy, then, and only then, [may] a court look to extraneous matters to determine whether a defense is required of the insurer." *Id.*; *see also City of Willoughby Hills v. Cincinnati Ins. Co.*, 9 Ohio St. 3d 177, 180 (1984) (if complaint pleads an arguably covered claim, then "the 'scope of the allegations' may encompass matters well outside the four corners of the pleadings"); *Ferro Corp. v. Cookson Grp.*, 561 F. Supp. 2d 888, 899–900 (N.D. Ohio 2008) (Lioi, J.) (same).

Here, however, Sireco's claim for damages to its roof is not "potentially or arguably" covered. The claim is for damages Sireco has incurred or will incur to fix Myers's negligent work

on the roof itself, and thus outside the policy's coverage.[4] Resort to extrinsic materials for purposes of fleshing out Sireco's claims is therefore unnecessary and impermissible under *City of Willoughby Hills*, *supra*, 9 Ohio St. 3d at 181, and *National Dairy Herd*, *supra*, 141 Ohio App. 3d at 279.

### 3. Covered Damages

Sireco's complaint also seeks damages in the form of the "remediation costs" it incurred to SpillTek and two other companies. (Doc. 10–3 at ¶¶43, 47).

These damages are a paradigmatic example of "consequential damages stemming from [an insured's] work." *Heile*, *supra*, 136 Ohio App. 3d at 354. They do not represent the costs Sireco incurred to fix Myers's work on the roof. Rather, these costs arose because Myers's alleged negligence caused a separate "occurrence": the sealant's runoff from Sireco's roof and its discharge into Lake Erie.

Myers's policy unambiguously provides coverage for these damages. *Westfield*, *supra*, 133 Ohio St. 3d at 482; *see also JTO*, *supra*, 194 Ohio App. 3d at 324 (hotel's claim for damages associated with water filtration caused by insured's negligent workmanship triggered duty to defend).

---

[4] Myers does not argue that either the "property damage" Sireco alleged in its complaint, or the "damages related to . . . the repair of its Building," was an "occurrence" caused by his allegedly negligent work on the roof. Rather, his briefs treat the claimed "property damage" and the "damages related to . . . the repair of [Sireco's] Building" as synonyms for the damage to the roof itself. (Doc. 41 at 6, 8–9; Doc. 45 at 3). In any event, Sireco's complaint, which does not identify any damaged part of its building besides the roof, does not appear to provide support for an argument that Myers's negligent roofing work caused an "occurrence" by damaging some other part of the building. *Cf. Paramount Parks*, *supra*, 2008-Ohio-1351, at ¶27 (rejecting insured's argument that claim seeking damages for defectively constructed roller coaster alleged an additional "occurrence" besides the defective coaster itself – namely, "the breaking of wood on the roller coaster" – because "these allegations regarding the breaking of wood . . . are *not* in the original complaint") (emphasis in original).

### C. Exclusions

Absent some applicable exclusion, Mesa has a duty to defend Myers in the state-court litigation. Mesa identifies four exclusions in Myers's policy, but I need discuss only one: the "Total Pollution Exclusion." Under that exclusion, the policy does not cover:

**f.**  **Pollution**

    **(1)**  "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

    **(2)**  Any loss, cost or expense arising out of any:

        **(a)**  Request, demand, order or statutory or regulatory requirement that any insured or other test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

        **(b)**  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

(Doc. 1–6 at 52).

The policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." (*Id.* at 45).

Mesa argues that this exclusion applies because the roofing sealant is a "pollutant," and Sireco's remediation costs stem from the dispersal, seepage, release, and/or escape of the sealant from the roof and into Lake Erie. (Doc. 39 at 19). It also argues that Sireco sustained the damages

at issue because the Coast Guard ordered it to remediate the spill, in which case section (f)(2) precludes coverage.

Myers concedes that this exclusion relieves Mesa of any duty to defend him, and I accept the concession. (Doc. 41 at 9) ("it is logical to conclude that the damages for remediation to Sandusky Bay were caused by the roofing product's seepage, migration, or escape from the roof").

Given the evidence of record, moreover, a reasonable jury could conclude only that the roofing sealant was a "pollutant," and that its escape from Sireco's roof and release into Lake Erie caused the damages at issue.

It is undisputed that the sealant is "harmful or fatal if swallowed," that its manufacturer urges "immediate" action in the event of a spill, and that Myers and his crew donned protective gear when applying the sealant. (Doc. 39 at 4, 31–32).[5] It is also undisputed that the pollutant escaped from or seeped off the roof and flowed into Lake Erie. And there is no dispute that the damages Sireco seeks are the costs it incurred cleaning up the sealant that made its way into the lake.

Accordingly, the Total Pollution Exclusion relieves Mesa of any obligation to defend Myers against this claim.

Myers insists that this exclusion "does not apply to bar coverage for Sireco's claim for property damage to the building itself." (*Id.* at 8). Myers argues that the damage to the roof "was not caused by a discharge, dispersal, seepage, migration, release or escape" of the sealant, but by the sealant's failure to harden. (*Id.*).

---

[5] Myers "do[es] not concede" that the sealant is a "pollutant" (Doc. 41 at 8), but he offers no evidence that would permit a reasonable jury to find otherwise.

This argument misses the mark, given my determination that the damages to Sireco's roof resulted from Myers's own faulty workmanship. Because those damages do not stem from an "occurrence," I need not consider whether they are also subject to the Total Pollution Exclusion.

Finally, Myers argue I should ignore Sireco's claims for consequential damages when considering how to apply the Total Pollution Exclusion. He contends that "SpillTek has been compensated for its remediation work by the United States," and that those damages "are no longer part of the pending litigation in state court." (Doc. 41 at 9).

This argument is meritless. The only damages claim here that survives *Westfield* is Sireco's claim for its remediation costs. Were I to ignore that claim entirely, as Myers urges, and focus on the damage to the roof, Mesa would still have no duty to defend Sireco's suit.

## Conclusion

It is, therefore,

ORDERED THAT:

1. Mesa's motion for summary judgment (Doc. 39) be, and the same hereby is, granted; and

2. Myers's motion for summary judgment (Doc. 41) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge